## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Keith Brown, being duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Boston, Massachusetts Field Office.  Since joining the FBI in 2014, I have been assigned to squads that investigate economic crimes, including various forms of corporate and securities fraud.  I received training at the FBI Academy, Quantico, Virginia, in a variety of investigative and legal matters, including Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.

2.      Pursuant to this affidavit and criminal complaint, I seek to charge FREDERICK SHARP, LUIS CARRILLO, MIKE VELDHUIS, and COURTNEY KELLN with (i) conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, and (ii) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.l0b-5.

3.      As described herein, I have probable cause to believe that each of SHARP, CARRILLO, VELDHUIS, and KELLN (collectively, the "DEFENDANTS") directed and/or participated in a sophisticated and lucrative securities fraud scheme involving undisclosed control of the securities of multiple microcap—or "penny"—stock companies, which securities were sold to unsuspecting investors in Massachusetts and throughout the United States during pump-and-dumps.

4.      Because this affidavit is being submitted for the limited purpose of demonstrating that there is probable cause to arrest each of the DEFENDANTS on the federal criminal charges set forth above, I have not included each and every fact known to me and to other law

enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested warrant.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses.

### RELEVANT ENTITIES, PRINCIPLES, AND DEFINITIONS

5.      The Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government.  The SEC is responsible for enforcing the federal securities laws and promulgating rules and regulations thereunder.  Those laws, rules and regulations are, among other things, designed to protect the investing public by maintaining fair and honest securities markets and eliminating manipulative and deceptive trading practices.

6.      "Transfer agents" are companies that, among other activities, issue and cancel certificates of a company's stock to reflect changes in ownership, such as when stock is changing hands.  Many companies with publicly traded stock use transfer agents to track the ownership of their stock.

7.      Microcap stocks, also known as "penny" stocks, are among the securities that are subject to the federal securities laws.  These stocks are, as a general matter, securities of publicly traded companies that have a low market capitalization and a low price per share (frequently, though not always, $1 or less).  Microcap stocks are most often traded on the "over-the counter" market, rather than on national exchanges such as the New York Stock Exchange or the NASDAQ, and tend to be thinly traded.  In addition, less information is typically available to the investing public about companies that issue microcap stock, although such companies sometimes register their shares with the SEC under Section 12 of the Securities Exchange Act of 1934 and thereby become subject to certain reporting requirements, such as the filing of annual reports

with the SEC.  Additionally, large blocks of microcap stock are often controlled by a small number of individuals, which can make it easier to orchestrate manipulative trading in those stocks.

8.      Among the ways that federal securities laws and regulations aim to protect investors is by (i) mandating certain disclosures by holders of large quantities of stock registered with the SEC, and (ii) limiting the ability of executive officers, directors, and large shareholders to quickly sell significant amounts of their stock (regardless whether it is registered with the SEC) in the open market.

9.      For example, when a person or group of persons acquires beneficial ownership[1] of more than five (5) percent of a voting class of stock registered with the SEC, the person or group is required to file a Schedule 13D with the SEC disclosing such ownership and setting forth background information about the owner(s) and their investment intentions.  As part of their compliance programs, brokers often ask individuals seeking to deposit shares in microcap stocks whether they own or control more than five percent of the issuer's shares.

10.      Similarly, control securities—which are securities owned by a person who directly or indirectly controls the issuer, either alone or as a member of a control group—are subject to Rule 144 of the Securities Act of 1933 ("Rule 144") [17 CFR § 230.144].  The term "affiliate" is used to describe such a control person or group, and persons or groups holding more than 10 percent of a company's stock are generally deemed to be affiliates.  In the context of securities traded "over-the-counter"—such as most microcap stocks—Rule 144 provides that an affiliate cannot sell more than one percent of the issuer's total outstanding shares in any three-

---

[1] A beneficial owner is any person who directly or indirectly has (or shares) voting or investment power, which includes the power to sell or direct the sale of a security.

month period.  Rule 144 was enacted to "implement the fundamental purposes" of the Securities

Act of 1933, namely to "provide full and fair disclosure of the character of the securities sold in

interstate commerce … and to prevent fraud in the sale thereof."  37 Fed. Reg. at 596.  As part of

their compliance programs, brokers often ask individuals seeking to deposit shares in microcap

stocks whether they are an officer, director, 10 percent shareholder, or otherwise an affiliate of

the issuer.

11.     Rule 144 also places certain restrictions on the selling of so-called "restricted"

securities.  Such shares, which are acquired directly from issuers and are not registered with the

SEC, generally cannot be sold to the public and bear a legend indicating that they are

"restricted."  Shares that are registered with the SEC, and that do not bear a legend indicating

they are restricted, are considered "unrestricted" or "free-trading," and may be sold in the market

by non-affiliates.  Rule 144 also identifies circumstances in which a shareholder holding

restricted shares can have the legend removed, enabling the shares to become free-trading.  One

such circumstance is if the shareholder is a non-affiliate and has held the shares for a certain

period of time, typically either six months (if the company's shares are registered under Section

12) or one year (if the company's shares are not so registered).

12.     The total number of unrestricted securities deposited with brokers and available

for trading is known as the "float."  For example, if hypothetical company Acme Corporation

issued 10 million shares, but only one million were unrestricted and deposited with brokers (and

thus available to be traded), the "float" would be one million shares.  The remaining nine million

shares might be a mix of restricted shares and unrestricted shares not yet deposited with any

broker.  Like individuals who control greater than 10 percent of a company's total outstanding

shares, individuals who control a majority of a company's float are also likely to be control persons and, therefore, affiliates for purposes of Rule 144.[2]

13.     I know from my training and experience that one form of fraud in the securities markets involves individuals (or groups of individuals) acquiring and exercising control over a significant portion of an issuer's shares, and often a majority of an issuer's float, while concealing their affiliate status.  In such a scheme, after acquiring a large portion of an issuer's free-trading shares, the individual or group will typically distribute those shares among accounts held in the names of "nominees"—including sham entities and other third parties—to help conceal their identities as the true owners of the stock.  In so doing, the perpetrators seek to avoid and circumvent the reporting requirements and restrictions in the securities laws discussed above, as well as the controls put in place by brokerages selling the stock.  The perpetrators then sell their shares via the nominees to the unsuspecting public in contravention of the securities laws.  The proceeds from such sales are often then funneled back to the perpetrators or to third parties at the perpetrators' direction.  This type of "concealed control" scheme occurs most frequently in the market for microcap stock.

14.     I know from training and experience that these concealed-control schemes are often accompanied and supported by stock manipulation in the form of "pump-and-dumps."  A "pump-and-dump" typically involves an effort to artificially inflate the stock price or trading volume of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's float can sell their shares at artificially high prices, or in a more liquid market, to other investors (the "dump").  Typically, such schemes involve the use, among other

---

[2] *See Sec. & Exch. Comm'n v. Longfin Corp.*, 316 F. Supp. 3d 743, 759 (S.D.N.Y. 2018).

means, of news releases, email blasts, and other forms of promotion—often containing false or exaggerated information—to inflate the stock price and trading volume and generate demand for the shares.  Often such schemes also employ "boiler rooms," wherein multiple individuals work in a coordinated effort to contact potential investors, often through unsolicited "cold calls," and provide false, misleading, unfounded, and/or exaggerated information about the company in order to induce the potential investors to purchase shares.

## RELEVANT INDIVIDUALS

15.    Defendant FREDERICK SHARP, age 69, is a resident of British Columbia, Canada.  During the relevant time period, SHARP was associated with Corporate House, which he previously described as a "firm of private investment bankers with offices in Canada and affiliations worldwide."  SHARP was at one time an attorney, but voluntary relinquished his law practice certificate in or about 1997.

16.    Defendant LUIS CARRILLO, age 47, is a U.S. citizen and is believed to be a resident of Mexico.  Publicly available bar records reflect that CARRILLO was admitted to practice as an attorney in New Jersey (2000), New York (2002), and California (2005), and that he practiced in San Diego, CA.  In March 2013, the SEC filed a civil action against CARRILLO and others in the United States District Court for the Southern District of New York alleging violations of the anti-fraud provisions of the federal securities laws.  The SEC's complaint alleged that CARRILLO and others engaged in pump-and-dump schemes involving two companies' securities.  A default judgment was ultimately entered in 2017 after CARRILLO ceased defending the action following a court order requiring that he sit for a deposition in New York.

17.     Defendant MIKE VELDHUIS, age 41, is a resident of British Columbia, Canada.
During the relevant time period, VELDHUIS at times associated himself with an entity known as
Venture Capital First LLC.

18.     Defendant COURTNEY KELLN, age 41, is a resident of British Columbia,
Canada.  During the relevant time period, KELLN worked for and supported SHARP.  KELLN
associated herself with the entities Celtic Consultants LLC and Esquire Corporate Services SRL.

19.     Co-Conspirator 1 ("CC-1") is a resident of British Columbia, Canada.  During the
relevant time period, CC-1 also worked for and supported SHARP.

20.     Cooperating Witness 1 ("CW-1") is the founder, owner, and chief executive of a
purported asset management firm based in Switzerland (the "Asset Management Firm").[3]
During the relevant time period, CW-1 managed the Asset Management Firm on a day-to-day
basis, including by generally placing all stock trades on behalf of the firm's clients.  CW-1 has
met with each of the DEFENDANTS several times in person and communicated with them very
frequently during the relevant time period.

21.     Cooperating Witness 2 ("CW-2") worked for the Asset Management Firm
beginning in or around 2014 and through the relevant time period.[4]  CW-2 was formerly

---

[3] In 2020, CW-1 pleaded guilty to securities fraud offenses in the United States District
Court for the District of Massachusetts in connection with his/her participation in pump-and-
dump schemes involving an undisclosed control group.  S/he is cooperating with the
government's investigation in the hope of obtaining leniency when s/he is sentenced.  As
described herein, information provided by CW-1 has been corroborated by, among other things,
documents, emails, other electronic messages, and trading records, as well as interviews with
CW-2.

[4] In 2019, CW-2 pleaded guilty to securities fraud offenses in the United States District
Court for the District of Massachusetts in connection with his/her participation in pump-and-
dump schemes involving an undisclosed control group.  S/he is cooperating with the
government's investigation in the hope of obtaining leniency when s/he is sentenced.  As
described herein, information provided by CW-2 has been corroborated by, among other things,

associated with a separate legal entity, but took direction from CW-1.  CW-2 was responsible for

a number of back-office tasks for the Asset Management Firm, including incorporating

companies and opening bank accounts for clients, processing redemptions for clients, assisting

with trade reporting, and general information technology tasks.  CW-2 has met each of the

DEFENDANTS in person and communicated with them very frequently during the relevant time

period.

22.     Cooperating Witness 3 ("CW-3") is a resident of Florida.[5]  During the period

2016 through 2018, CW-3 had a management role in multiple boiler rooms.  CW-3 has met

CARRILLO multiple times.

## OVERVIEW OF THE SECURITIES FRAUD SCHEME

23.     Based on the evidence described herein, I have probable cause to believe that,

from no later than 2014 through no earlier than September 2018, each of the DEFENDANTS,

together with multiple co-conspirators, directed and/or participated in sophisticated pump-and-

dump schemes involving concealed-control of large portions of stock in several microcap

companies that netted, at a minimum, tens of millions of dollars in illicit proceeds.

---

documents, emails, other electronic messages, and trading records, as well as interviews with
CW-1.

[5] CW-3 is expected to plead guilty in the United States District Court for the District of
Massachusetts to securities fraud in connection with the operation of a boiler room in support of
a pump-and-dump scheme.  CW-3 has also pleaded guilty to a charge of conspiracy to commit
wire fraud in the United States District Court for the Eastern District of New York, also in
connection with the operation of a boiler room.  CW-3 is cooperating with the government in the
District of Massachusetts in the hope of obtaining leniency when s/he is sentenced, including via
a consolidated sentencing in the Eastern District of New York.  As described herein, CW-3 has
been corroborated by, among other things, emails and bank records, as well as interviews with
CW-1 and CW-2.

*The Nominee Entities*

24.     The scheme generally involved a similar series of steps for each microcap stock, with each iteration often referred to as a "deal" by those involved.  Each deal would often begin with an individual or group of individuals acquiring control of a significant portion of a microcap company's free-trading shares—if not all such shares—through various nominee entities. CARRILLO and VELDHUIS each acted as point persons for such control groups.  On numerous occasions, for CARRILLO's or VELDHUIS's respective benefit, CW-1 and/or CW-2 facilitated the deposit of shares of microcap companies into brokerage accounts in the Asset Management Firm's name, knowing that CARRILLO or VELDHUIS, along with their associates, controlled a significant portion of the company's shares through nominees.[6]  Each of the nominee entities generally held less than five percent of the given company's shares in order to avoid disclosure obligations under the federal securities laws and to circumvent brokers' compliance protocols.

25.     CW-1 and CW-2 have explained that the nominee entities CARRILLO and VELDHUIS used to conceal their control were often controlled by SHARP, who charged a fee for this and related services.  KELLN, who described herself in 2013 as in charge of "client relations" for SHARP's business, described CARRILLO and VELDHUIS as "tier 1" clients of SHARP's in an encrypted message in September 2017.

26.     The Asset Management Firm's records reflect that shares deposited by SHARP's nominees drove the majority of the firm's business.  Those records, along with records from SHARP's business itself and statements from CW-1 and CW-2, reflect that SHARP operated a

---

[6] CW-2 knew VELDHUIS primarily by his codename "Acco," which is discussed further below, as well as by his first name.  CW-2 positively identified a picture of VELDHUIS as the individual he knew as "Acco."

sophisticated platform that provided a variety of services to control persons seeking to conceal their identity when selling large quantities of shares of penny stock companies.  As described more further herein, the array of services SHARP offered included (i) forming and providing offshore nominee entities to hold shares for undisclosed control persons; (ii) providing and administering an encrypted and closed communication network on dedicated BlackBerry devices—referred to as "xphones"—for use by control persons and other co-conspirators; (iii) facilitating the deposit of stock with the Asset Management Firm in blocks of less than five percent via SHARP's nominee entities; (iv) administering a proprietary web-based accounting system that tracked clients' total stock holdings, sales, and proceeds (known as the "Q" system); and (v) facilitating the payment of illegal stock sale proceeds to accounts around the world at control persons' directions, including through the use of fake invoices that concealed the true nature of the payments.

27.     In one client communication via xphone in July 2013, SHARP described his service as follows:  "The service provided is comprehensive; it is not limited to trading.  It includes pyaments [sic], loans, private placements <u>and keeping clients out of jail</u>" (emphasis added).

28.     At SHARP's request, CW-1 and CW-2 at times incorporated nominee entities for SHARP's use as part of the scheme, and at times also served as directors of entities that were, in turn, directors of SHARP's nominee entities.  Encrypted messages involving SHARP reflect that SHARP controlled the nominee entities, which were effectively interchangeable.  For example, in one message with CW-1, SHARP described planning to transfer the assets from one nominee entity to another and then closing the first nominee so as to "recycle the accounts."

29.     SHARP's name was not identified in documents connected with the nominee

entities.  Rather, on paper, these entities were owned by third-party beneficial owners, and all

formal documentation associated with the entities—such as share purchase agreements and wire

requests—would use the purported beneficial owners' names.  For SHARP's nominee entities,

however, CW-1 and CW-2 only took direction from SHARP or SHARP's delegates, such as

KELLN.  With limited exceptions, CW-1 and CW-2 generally did not interact with the third-

party beneficial owners.

30.     CW-1 and CW-2 also incorporated nominee entities at CARRILLO's request for

use in the scheme, the purported beneficial owners of which were all Mexican nationals.

CARRILLO's name likewise was not identified in documents connected with these nominee

entities.  But in reality, as CW-1 and CW-2 knew, the entities they incorporated at the direction

of CARRILLO were controlled by CARRILLO, and CW-1 and CW-2 took direction only from

CARRILLO or his delegates for those entities.

31.     The DEFENDANTS, along with CW-1 and CW-2, had at least two distinct lines

of communication in connection with the scheme.  The formal line of communication would take

place over ordinary emails between (i) the formal email accounts associated with Asset

Management Firm and (ii) the nominee entities, each of which had its own email account.

Emails to and from the Asset Management Firm reflect that the formal line of communication

would be used, for example, when a nominee entity was seeking to deposit a tranche of shares

via the Asset Management Firm or to submit a wire request for purposes of sending out stock

sale proceeds.

32.     A second line of communication involved encrypted messaging platforms.  The

government has obtained and reviewed thousands of these encrypted communications involving

the DEFENDANTS, which would be used to discuss how shares would be split up among nominee entities, to provide updates as to when shares would be deposited and ready to trade via the Asset Management Firm, to provide trading orders to the Asset Management Firm for shares held across multiple nominee entities, and to check on the status of wire payments of illicit proceeds, among other communications.

33.     One of the encrypted messaging platforms the DEFENDANTS used was provided by SHARP.  CW-1 and CW-2 have explained, and records obtained by the government have confirmed, that SHARP maintained an encrypted and closed communications network on a server in Curacao that was in use from approximately 2013 through 2015.[7]  SHARP provided co-conspirators, including CW-1, with BlackBerry phones connected to the network so they could engage in secure communications in furtherance of the scheme.  Users referred to their BlackBerry phones as "xphones," and accounts on the system were identified either by account numbers or code names.  A "key" located in the Asset Management Firm's records, as well as statements of self-identification in the messages themselves and statements by CW-1 and CW-2, reflect that each of the DEFENDANTS had an account on the xphone system.

34.     Other encrypted platforms included the use of secure email services, such as ProtonMail, and encrypted smartphone messaging applications, such as Threema.  CARRILLO, for example, at times sent wire requests for his nominee entities via ProtonMail to the Asset Management Firm.  And records obtained by the government reflect that each of CARRILLO, VELDHUIS, KELLN, CW-1, and CW-2 used Threema to communicate frequently in the period

---

[7] In March 2020, pursuant to a Mutual Legal Assistance Treaty ("MLAT") request, the U.S. Attorney's Office for the District of Massachusetts received forensic copies of four servers from Curacao.  Among the materials included on the servers were hundreds of thousands of messages from the phone network maintained by SHARP.

2016 through 2018.  When using these platforms, the DEFENDANTS would often use codenames for their user IDs, and CARRILLO and VELDHUIS regularly changed their codenames.  Communications among and between these same individuals reflect that they also used many of these same codenames to refer to each other.  CW-1 and/or CW-2 have identified, and messages among and between the DEFENDANTS, CW-1, and CW-2 have corroborated, that: (i) CARRILLO's various codenames included "Poker," "Fire," "Spartacus," "Iceman," and "Mamba"; (ii) VELDHUIS' various codenames included "Acco," "Usual Suspects," "Kobayashi," and iterations of "Stockman"; (iii) KELLN's various codenames included "Celt" and "Esquire"; and (iv) SHARP's codename was consistently "Bond."[8]

35.     CW-1 and CW-2 have further explained that, when CARRILLO and VELDHUIS used SHARP's nominee entities in furtherance of the scheme, KELLN often prepared the share purchase agreements and other documents that were provided to transfer agents and brokers to facilitate the breakdown, transfer, and deposit of the control shares into blocks of less than five percent.  KELLN's encrypted communications with CW-1 and CW-2, as well as with other SHARP clients via the xphone, reflect that KELLN played this role in the scheme.

---

[8]     CW-1 advised that VELDHUIS had a partner with whom he frequently worked (Co-Conspirator #2 ("CC-2")), and CW-1 identified "Stockman" as associated with CC-2. Encrypted messages with CW-1 and CW-2 reflect that three different iterations of "Stockman" were used in communications with CW-1 and CW-2:  Stockman, Stockman00, and Stockman007.  Based on the content of the messages, I have probable cause to believe that "Stockman" and "Stockman007" were used by VELDHUIS, and Stockman00 was used by CC-2. On February 14, 2017, "Stockman" sent an encrypted message to CW-1 and CW-2 stating "I am ACCO," which is a codename both CW-1 and CW-2 identified as associated with VELDHUIS. In addition, on January 25, 2017, "Stockman" told CW-1 and CW-2 that he would be in London the next two days, which matches travel records for VELDHUIS.  Next, CW-1 provided the user ID for "Stockman007" to CARRILLO in October 31, 2016, stating it was associated with "Mike."  And finally, on May 26, 2018, "Stockman00" sent an encrypted message to CW-2 stating "New phone," followed by CC-2's first name.

36.     Transfer records reflect that, in many instances, free-trading shares flowed through two tranches of SHARP's nominee entities before being deposited with the Asset Management Firm.  CW-1 and CW-2 both understood that share purchase agreements purporting to reflect arms-length transactions between the two tranches of SHARP nominee entities were fake; no consideration was paid, as SHARP and the control group controlled both sides of the transactions.  KELLN's communications with CW-1 and CW-2 reflect that she was responsible for drafting these sham share purchase agreements and otherwise facilitating the transfer of shares among SHARP's nominee entities.

37.     KELLN's communications also reflect that she was taking direction from CARRILLO, VELDHUIS, and other SHARP clients regarding the timing of share transfers and deposits, coordinating these transfers and deposits with CW-1 and CW-2, and ensuring that no one nominee entity owned more than five percent of a company's stock at any point in time. KELLN's communications reflect that she was aware of, and closely monitored, the five percent threshold.  For example:

        a.      In December 2013, KELLN messaged SHARP and two other individuals via xphone to raise a concern about a five-percent threshold issue.  KELLN noted that the issuer of a particular stock had "90m issued and out" but that "u guys want me to cancel 2,175m for each of the management," which would "knock the issued and out down to 46.5m."  KELLN indicated that this would be a problem, because it would "mean that ever [sic] single account we have stock cleared(ing) in will be well over 5%."  KELLN asked "what should I do," adding that "[w]e have no room to move the stock as every account had it."  One of the individuals responded, "We were just about start [sic] promoting on monday bought and paid

for, how long will this take to sort out?"  Later that same day, KELLN wrote the group again, noting that the issue was "under control and Bond [i.e., SHARP] confirms u can go ahead with ur promotion.  There will be no issues as we thought."

b.       In July 2014, KELLN messaged CW-1 via xphone alerting him/her that she would be sending the Asset Management Firm a deposit of approximately 5.1 million shares of stock for a particular SHARP nominee entity's account.  She noted that "it seems there is a lot of stock there already" and then asked, "Can we transfer the 4.8m in [that SHARP nominee entity account] to [a different SHARP nominee entity account] as to not be over 5%?"  A few weeks later, SHARP messaged KELLN to identify the same "problem," noting that, if both blocks of stock were held in the same account, it would equal "about 10%."  From my training, experience, and investigation of this case, I believe this to be a reference to 10% of the issuer's total outstanding shares.  KELLN responded that "Yes [CW-1] is supposed to transfer the 4.8m out" to another client.  The Asset Management Firm's records reflect that it did, in fact, move the 4.8 million shares out of one SHARP nominee entity account and into another SHARP nominee entity account in or about August 2014, before then selling all the shares held by both SHARP nominee entity clients by the end of December 2014.

c.       In March 2017, while discussing the timing of two deposits of stock for two different SHARP nominee entities, KELLN stated in a Threema chat with CW-1 and CW-2, "I'm always paranoid about the 5% rule."

15

38.     The communications further reflect KELLN's access to and control over the email addresses for SHARP's nominee entities, which were used to send the sham share purchase agreements and other documents to transfer agents and to the Asset Management Firm. For example, CW-1 and CW-2 received emails with documents from a nominee entity's email account close in time to receiving an encrypted message from KELLN discussing the documents. The nominee entities' email addresses also all generally shared the same email domain (either @yourmail.bz or @buzzmail.ltd).

39.     Following KELLN's breakdown of the control groups' shares into blocks of less than five percent, the nominee entities' shares would be assigned to the Asset Management Firm, which then deposited the stock with brokerage firms, often in omnibus accounts in the Asset Management Firm's name.  If and when asked, CW-1 provided false and misleading documents to brokerages representing, among other things, that the shareholder (i.e., Asset Management Firm, on behalf of the control group) owned less than five percent of the company's shares and/or was not a control person.  This service provided a "route to market" for CARRILLO, VELDHUIS, and their co-conspirators and enabled them to continue to hide their ownership and control of the shares and/or the company.

*Trading & Promotion*

40.     Once their shares were deposited, CARRILLO, VELDHUIS, or their delegates would then direct CW-1 and the Asset Management Firm to sell the shares, often specifying on an hour-by-hour and trade-by-trade basis the number of shares to sell and the prices at which to sell them.  These communications generally took place on the aforementioned encrypted applications.  CW-1, in turn, directed the brokers holding the shares in the Asset Management Firm's accounts to sell the shares.  When entering trade orders, CW-1 generally decided from

which nominee entity's account the trade would be placed.  On at least one occasion, CW-1

alerted VELDHUIS that, based on the amount of trading the Asset Management Firm was doing

for VELDHUIS, the firm was "Keeping you ahead of Fire [i.e., CARRILLO] in March [2017]."

VELDHUIS responded "That's not good.  I like being number 2."

       41.     CW-1 and CW-2 have admitted that, based on their communications with

CARRILLO and the market demand they witnessed being generated, they understood that

CARRILLO was coordinating his stock sales with promotional campaigns.  For example, CW-1

has explained that, even before CARRILLO's shares were fully deposited and ready to be sold,

CARRILLO at times told CW-1 that he knew that buyers were ready to purchase a large number

of his shares.  In one example, in August 2016, CARRILLO sent CW-1 and CW-2 an encrypted

message that a "big order [is] coming on" a particular stock and instructed them to "get the

trigger ready."  CW-2, at CARRILLO's direction, then sold into the demand that CARRILLO

had previewed.

       42.     Similarly, CW-1 has stated that s/he was aware that promotional campaigns were

conducted for multiple VELDHUIS deals, and encrypted communications reflect that

VELDHUIS engaged promotional firms to create demand for the shares he was selling through

the Asset Management Firm.  In August 2018, for example, VELDHUIS wrote to CW-1 and

CW-2 that he had an "urgent situation" that required $75,000 to be wired to a webmedia firm

whose invoice describes its work as providing an "Initial Kickoff Campaign," "Small Cap

Leader Native Advertising," and "Momentum Alerts."  From my experience with this

investigation and other penny-stock investigations, I understand these to be descriptions of

online stock promotions.  VELDHUIS continued, "As soon as I can get a wire out to … [the

webmedia firm] I can start selling. Right now it's pretty tough to get liquify."  From my training

and experience, I understand "liquify" to be a reference to liquidity, meaning the ability to readily sell shares to other investors.

43.     CARRILLO often also made comments such as "the room is on fire"—which CW-1 understood to refer to promotional activity by a boiler room—or otherwise referenced the promotional campaigns.  In or about October 2016, for example, CARRILLO sent an encrypted message to CW-1 and CW-2 stating that he would "stop the promo" before letting a competitor to the Asset Management Firm keep or sell a particular stock.  These communications, and the Asset Management Firm's stock sales for CARRILLO, often took place against the backdrop of very little prior trading in the respective stocks, corroborating the admissions by CW-1 and CW-2 concerning CARRILLO's control and involvement in the promotional campaigns—i.e., the "pump."

44.     CW-1 and CW-2 have also both advised law enforcement agents that CARRILLO introduced them to two individuals who operated a boiler room in Colombia between approximately 2016 and 2018 ("Boiler Room Operators 1 & 2").  The introduction took place during a trip to a ski chalet in Switzerland in or about January 2018, the invoice for which listed CARRILLO's name as well as the names of Boiler Room Operators 1 and 2.  The invoice was paid by the Asset Management Firm from an account associated with a CARRILLO nominee entity.

45.     CW-3 also corroborated CARRILLO's use of boiler rooms.  As discussed further below, CW-3 worked in a boiler room in Medellin, Colombia, in or about early 2016 with Boiler Room Operator 1 on a deal run by CARRILLO.  Like CW-1 and CW-2, CW-3 described CARRILLO as using the code name "Fire," among others.  CW-3 understood that Boiler Room Operator 1 received payment for his work via accounts in the names of family members,

including his/her spouse, because he could not open accounts in Colombia him/herself.  CW-3's

statements are corroborated by bank records reflecting that Boiler Room Operator 1's spouse

received approximately $1.7 million in payments during the period 2016 through 2017 from an

account associated with Boiler Room Operator 2, which itself received approximately $4.69

million in payments from the Asset Management Firm on behalf of nominees controlled by

SHARP or CARRILLO.

      46.     After selling shares at CARRILLO's and VELDHUIS' respective direction (or

their delegates), the Asset Management Firm recorded the sales in multiple systems.  Records

from the Asset Management Firm reflect that stock sales were tracked in a proprietary internal

system for the Asset Management Firm's own record keeping.  The Asset Management Firm

would also send periodic account statements to the nominee entities' email addresses when

SHARP requested them, as well as to CARRILLO directly for CARRILLO's nominees.  In

addition, when a client such as CARRILLO or VELDHUIS used SHARP's nominee entities,

CW-1 and/or CW-2 also entered the stock sales into SHARP's separate proprietary system

known as "Q."  The Q accounting system tracked, among other things, stock sales by stock and

by nominee, as well as commissions allocated to SHARP and the Asset Management Firm.[9]  The

Q system further tracked the subsequent remittance of stock sale proceeds, and each of

CARRILLO and VELDHUIS had their own accounts in Q to which stock proceeds would be

allocated and then remitted out to third parties.  Communications among and between SHARP,

KELLN, CW-1, and CW-2 further reflect that each had access to the Q accounting system.

Communications also reflect that SHARP would review the entries in the Q accounting system,

---

[9] The servers the U.S. Attorney's Office obtained from Curacao pursuant to a MLAT request also contained the Q accounting system database. *See supra* note 7.

as well as account statements for the nominees received from the Asset Management Firm, and bring to CW-1's attention any perceived discrepancies.

*Receipt of Proceeds*

47.     Proceeds from stock sales were held by the Asset Management Firm and allocated to the relevant nominee entities until SHARP, CARRILLO, VELDHUIS, and/or their co-conspirators directed the funds' transfer.  When the proceeds were associated with stock sales by SHARP's nominee entities, the directions would formally be sent to the Asset Management Firm by the nominee entities.  CW-1 and CW-2 described how such wire transfer requests were handled by CC-1, who worked for SHARP.  Encrypted messages reflect that CARRILLO or VELDHUIS directed CC-1 to issue wire transfer requests, which were subsequently sent from the nominee entity's email address to the Asset Management Firm.  CARRILLO and VELDHUIS then followed up periodically with CW-1 and CW-2 over encrypted communications to check on the status of the wires.  CARRILLO at times also sent a nominee entity's wire request directly to the Asset Management Firm via encrypted email.  When the wire requests came from SHARP's nominees, the formatting of the requests and/or invoices often closely resembled prior requests and/or invoices, and metadata reflects that they were frequently authored by CC-1.

48.     CW-1 shared, and the Asset Management Firm's records corroborate, that SHARP directed a significant amount of proceeds from the scheme to the nominee entity Cortona Equity, Inc, which the Asset Management Firm incorporated for SHARP in or about May 2017.  CW-1 identified funds going to this entity as SHARP's retirement fund, and the Asset Management Firm's records reflect that over $6.8 million was transferred to Cortona Equity between August 2017 and July 2018.  The funds were transferred from the account of one

of SHARP's nominee entities—Santos Torres, LLC ("Santos Torres")—that held and sold stock

for both CARRILLO and VELDHUIS.  The formal beneficial owner of Cortona Equity is an

individual whose resume reflects he is a tennis coach, and CW-1 identified him as SHARP's

spouse's coach.

49.     The Asset Management Firm's records also reflect payments being made from

stock sale proceeds for the benefit of SHARP's children.  For example, in January 2017, one of

SHARP's nominee entities that held and sold stock for both CARRILLO and VELDHUIS—

Quezon Group LLC ("Quezon")—submitted a wire request for $9,800 to be sent to SHARP's

daughter.  In February, after the wire had apparently not yet arrived, Quezon emailed the Asset

Management Firm, asking it to "trace this wire" because SHARP's daughter "needs the funds to

pay her rent!"

50.     Likewise, between approximately 2016 and 2018, CARRILLO and/or those with

whom he had a close relationship received or were the beneficiaries of millions of dollars in wire

transfers reflecting the proceeds of the scheme.  For example, bank records, invoices, and

communications reflect:

      a.      Between 2016 and 2018, approximately $1.4 million was transferred from

the Asset Management Firm through a series of Mexican companies to accounts

associated with CARRILLO.  On at least one occasion, CARRILLO emailed the

Asset Management Firm requesting that a wire be sent to one of the intermediary

Mexican companies.  The Asset Management Firm debited the wire transfers to

accounts associated, variously, with SHARP's or CARRILLO's nominees.

      b.      In or about 2016 and 2017, the Asset Management firm wired at least $1.8

million to a luxury watch retailer in Beverly Hills, CA.  Invoices reflect that the

payments were for watches CARRILLO purchased.  The Asset Management Firm also wired approximately $325,000 to a New York law firm to pay invoices associated with the firm's representation of CARRILLO in an SEC enforcement action.  The wires for the watches and the legal bills were debited to accounts associated, variously, with SHARP's or CARRILLO's nominees.

c.      In or about April 2017, the Asset Management Firm wired $134,500 to a BMW dealership in San Diego for the purchase of a BMW X5 M.  The purchase was in the name of a woman with an address in Chula Vista, CA, near San Diego. CARRILLO's name was on the insurance, as well as the dealership's internal emails discussing the wire payment.  Encrypted messages reflect that CARRILLO initially instructed CC-1 to submit the wire request from a SHARP nominee, but when CC-1 did not timely submit the request, CARRILLO directed the Asset Management Firm to wire the money from the account of a CARRILLO nominee instead.

d.      In or about July 2018, the Asset Management Firm wired more than $40,000 to a Colombian national for purported "event planning services."  CW-1 has advised law enforcement agents that s/he met the recipient in Paris with CARRILLO and understood that CARRILLO and the woman were involved in a romantic relationship.  The wire was debited to a CARRILLO nominee.

e.      In or about March 2018, the Asset Management Firm wired approximately $84,000 to a Swiss luxury chalet company to reserve a ski chalet for the 2018-2019 New Year's holiday.  The reservation was in the name of a CARRILLO

nominee, and CARRILLO was listed as the only "Passenger" on the reservation. The wire was debited to a CARRILLO nominee.

f.          In or about October 2017, the Asset Management Firm wired approximately $20,000 to a dental clinic in Geneva in connection with an invoice for dental work provided to CARRILLO.  The address for CARRILLO on the invoice was the same address in Chula Vista, CA, associated with the BMW purchase.  The wire was debited to a SHARP nominee.

51.     CW-1 has explained, and the data in the Q accounting system reflects, that stock sales were allocated to particular deals and associated with particular SHARP clients.  The clients would be identified by unique four-letter codes, and CW-1 has identified, and their communications corroborate, that CARRILLO's and VELDHUIS's account codes were SUSS and ACCO, respectively.  Review of the Q accounting system reflects that, during the period approximately 2015 through 2018, CARRILLO was associated with trading proceeds from sales by the Asset Management Firm for at least approximately 22 different issuers, with total proceeds in excess of at least $70 million.  Similarly, during the period approximately 2014 through 2018, VELDHUIS was associated with trading proceeds from sales by the Asset Management Firm for at least approximately eight different issuers, with total proceeds in excess of at least $23 million.  And across all clients (including but not limited to CARRILLO and VELDHUIS), during the period approximately 2014 through 2018, the Q accounting system reflects over 70 issuers traded by SHARP's nominee entities through the Asset Management Firm, with total proceeds in excess of $140 million.

*Concerns Regarding Law Enforcement*

52.     Communications involving SHARP, VELDHUIS, and KELLN reflect that each was concerned about, and took steps to prevent, law enforcement's discovery of the scheme. Examples include:

        a.     In November 2013, KELLN asked SHARP in a xphone message whether it was dangerous to bring with her to Switzerland her "hand written list of where and which stock is what," which she described as "all symbols and codes but its how I keep track of what's clearing [i.e., being deposited]."  SHARP responded "Its not dangerous over there.  Its dangerous when u come back (canada customs)."

        b.     In February 2015, VELDHUIS explained to SHARP in a xphone exchange that VELDHUIS had discovered that, "If the SEC did a IP trace on any of the e-mails" sent by SHARP's nominee entities, they would "know the location of the server," as well as see that one of the websites hosted on the server was an art website registered to SHARP and SHARP's daughter.  SHARP responded "We r moving [the art website] out today."  In addition, just as the exchange was starting, SHARP stated, "Unless encrypted u must assume you're being recorded" when speaking on the phone.

        c.     In November 2016, KELLN sent an encrypted message to CW-1 and CW-2 stating that she "had to delete her phone going thru customs."  CW-1 responded, "We approve of your security."

53.     Communications also reflect apparent jokes about law enforcement.  For example, in June 2015, VELDHUIS reported to KELLN in a xphone message that he had made it through

customs while on his way to Los Angeles and that he was "not in jail. So that's nice."  And in April 2017, VELDHUIS sent an encrypted message to CW-1 stating that "Today I was told that bond [i.e., SHARP] is an undercover agent."  CW-1 responded "I found that out in 2012[.] Spreading false news[.]"

## REPRESENTATIVE SECURITIES IN THE FRAUD SCHEME

### PureSnax International Inc. (PSNX)

54.     In 2015 and 2016, PureSnax International Inc. ("PureSnax") was a New Jersey-based company that described itself as a "wellness brand focused on bringing healthy snacks and foods to consumers."  The company was incorporated in Nevada in 2011 under a different name. Between September 2015 and September 2016, it traded on the over-the-counter market under the ticker symbol "PSNX."

55.     The company's filings and transfer agent records reflect that, in 2011 and 2012, the company issued 300 million common shares to its founder and 100 million common shares to 17 investors through a Form S-1 registered securities offering (the "PSNX S-1 investors") that purportedly raised approximately $25,000.  The shares purchased by the PSNX S-1 investors were free-trading, while the founder's shares were not.[10]

56.     Transfer agent and business incorporation records reflect that, between 2012 and 2015, 48 million of the PSNX S-1 investors' shares were transferred in two installments from five S-1 investors to two SHARP nominees, Inland Trading, Ltd. ("Inland"), and Redfern

---

[10] In or about June 2015, the company underwent a 40:1 forward stock split, issuing 40 shares for each existing 1 share.  The share amounts are set forth here on a post-split adjusted basis.

Investors, Ltd. ("Redfern").  Celtic Consultants—one of the companies associated with

KELLN—issued the transfer requests to PureSnax's transfer agent.

57.     In or about September 2014, 9.6 million shares held by Inland were purportedly

sold to yet another SHARP nominee entity—Quezon—and then deposited via the Asset

Management Firm with a broker.  And in July 2015, 10 million shares held by Redfern were also

deposited with a broker via the Asset Management Firm.  Together, these 19.6 million shares

accounted for 4.9 percent of PureSnax's total shares outstanding at the time.

58.     In or about September 2015, the founder's 300 million shares were transferred to

the company's president, who retired them in exchange for one million shares of convertible

preferred stock.  As a result, as of October 2015, PureSnax had only 101 million total shares

outstanding, and the 19.6 million Quezon and Redfern shares represented close to 20 percent of

the company's shares outstanding, and more than 40 percent of its float, the remainder of which

was held by either Inland or successor transferees.

59.     Thereafter, between November 2015 and September 2016, the Asset Management

Firm directed the sale of nearly all of those shares, generating proceeds of approximately $1.4

million.  The overwhelming majority of the sales commenced in March 2016.  Historical price

data reflects that PSNX's stock price more than doubled between the beginning of March and

mid-May 2016, rising from $0.35 to $0.82 per share, before crashing to $0.01 at the end of

September 2016.

60.     Consistent with this price spike, CW-3 has advised law enforcement agents that,

in March 2016, s/he worked in a Medellin boiler room hired by CARRILLO to generate demand

for PSNX.  Email communications corroborate that CW-3 was in Medellin in early 2016.  CW-3

has told agents that s/he worked with, and sat beside, CARRILLO in the boiler room, which

CW-3 helped to manage with Boiler Room Operator 1.  CW-3 recalled that CARRILLO told him/her that he controlled all of PureSnax's shares, which he said included 40 to 50 million shares ready to sell and another 60 million shares that were available.  These figures are consistent with the 100 million shares that records reflect were sold to the original S-1 investors, of which 48 million were transferred to the SHARP nominees.

61.     CW-3 told agents that CARRILLO taught boiler room members how to pitch PSNX to prospective investors, and provided the room with a Customer Relationship Management (CRM) system to place and track calls.  CW-3 said s/he used the CRM system to solicit investors using a fake name while making exaggerated and/or false statements about PureSnax and its growth opportunity.  CW-3 knew the stock did not present a growth opportunity because the shares were being dumped at CARRILLO's direction, a fact that was not disclosed to prospective investors.  CW-3 described witnessing CARRILLO direct stock sales from inside the boiler room while CW-3 and others placed calls to prospective investors.  CW-3 said s/he spoke with CARRILLO on a daily basis about how many shares CARRILLO planned to sell, as well as about CARRILLO's "capture" rate, meaning how many sales the boiler room successfully made to investors.  CW-3 explained that s/he periodically bought shares in companies the boiler room promoted in order to help maintain the stock's price.  Brokerage records corroborate that CW-3 purchased 1200 shares of PSNX in May 2016, which s/he then sold three days later.

62.     An investor in South Yarmouth, MA was among those who received phone calls soliciting investments in PSNX, including from an individual using CW-3's fake name.  The Massachusetts investor subsequently purchased PSNX shares while the Asset Management Firm was dumping shares.

63.     Bank records reflect that CW-3, through a company s/he created, received over $100,000 from the Asset Management Firm in or about March 2016, which CW-3 identified as compensation for his/her work in the PSNX boiler room.  Two of the payments were debited to Quezon, which was selling PSNX at the time.  CW-3 received additional payments from the Asset Management firm in or about April, August, and October 2016.  The April and August payments were debited to SHARP nominees, while a $50,000 payment in October was debited to a CARRILLO nominee.[11]

64.     CARRILLO discussed his involvement with PureSnax in messages sent via xphone, and those xphone messages reflect that CARRILLO was involved in, and exercised control over, the set up for the PSNX deal and the shares being sold during the relevant period. For example, in October 2015, SHARP messaged CARRILLO, asking "What's up … [w]ith your deals," including "psnx," adding "Is anything going to trade this year?"  CARRILLO responded that another xphone accountholder, Co-Conspirator 3 ("CC-3"), is "coordinating IR," which I know from training and experience stands for "investor relations" and is a synonym for a promotional campaign.  CARRILLO added "I'm involved but more to get it ready."  In early November, CC-3 emailed CARRILLO to alert him that some "Psnx news" needed his approval. CARRILLO responded, suggesting that CC-3 "reduce some of the irs details."  The next day, PureSnax issued a press release announcing that it had appointed a new chief financial officer, who had begun his career at the Internal Revenue Service.  Also that day, SHARP emailed CARRILLO and CC-3, asking "When will selling start?"  Then, during the last full week in

---

[11] Other payments debited to the same CARRILLO nominee during the preceding two months included two $100,000 payments to CARRILLO's law firm and a $200,000 payment to a company associated with Boiler Room Operator 2.

November, CARRILLO messaged SHARP, stating that he and CC-3 would be "starting PSNX next week" and asking permission to "trade directly with" the Asset Management Firm.  SHARP responded "Si," or "Yes" in Spanish.  And on December 1, 2015, CARRILLO messaged SHARP, stating "psnx started today," to which SHARP responded "Yay."  That same day, according to its internal records, the Asset Management Firm made its first substantial PSNX sale, selling 175,000 shares.[12]

65.     The Asset Management Firm's files contained an export from SHARP's Q accounting system of the "PSNX" account as of June 2016.  Under a summary of "Account Holdings," the file listed 45,310,346 million PSNX shares still available to be sold and 52 million shares as in "Escrow," which amount was equal to the number of shares still purportedly in the hands of the remaining S-1 investors.  The file also listed PSNX stock sales made through the Asset Management firm since November 2015, as well as additional PSNX stock sales through another firm.  The file also listed debits—i.e., outgoing payments—to CW-3's company in April 2016 and to Boiler Room Operator 2 in April and May 2016.  In addition, the file listed two debits in 2015, totaling over $14,000, to an individual with the same last name as four of the five S-1 investors who transferred their shares to SHARP's nominees.[13]

## Garmatex Holdings, Ltd. (GRMX)

66.     In or about early 2017, Garmatex Holdings, Ltd. ("Garmatex") was a British Columbia-based company that was purportedly planning to complete a reverse merger with a private company, Garmatex Technologies, Inc.  Following the anticipated merger, Garmatex

---

[12] The Asset Management Firm's records reflect that it also sold 10,030 shares five days earlier on November 27, 2015.

[13] The name appears to be slightly misspelled in the second entry.

would purportedly commence operations in the "development and supply of scientifically engineered fabric technologies."  The company was incorporated in Nevada in 2014 under a different name (and changed its name again after 2017).  In 2017, Garmatex traded on the over-the-counter market under the ticker symbol "GRMX."

67.     The company's filings and transfer agent records reflect that, in or about September 2014, Garmatex issued 15 million shares to 32 investors through a Form S-1 registered securities offering (the "GRMX S-1 investors"), raising a reported $9,000.  The GRMX S-1 investors were all from the same state in Mexico, and the shares they received were free trading.  Garmatex's transfer agent sent all 32 of the physical share certificates to an attorney in Nevada.

68.     Garmatex reported that, as of March 15, 2017, it had approximately 35.5 million shares outstanding.[14]  In February and March 2017, 5.25 million of the GRMX S-1 investors' shares—representing just under 15 percent of GRMX's total outstanding shares—were transferred to SHARP nominees and ultimately deposited with brokers via the Asset Management Firm.  The shares were broken into blocks of 1.75 million shares each (representing just under five percent of GMRX's total outstanding shares).  To make each block, three GRMX S-1 investors purportedly sold their shares to a SHARP nominee entity.

69.     The two SHARP nominees that acquired shares in the first two tranches of sales, which took place in February 2017, had their share certificates sent to the same individual in Vancouver, British Columbia.  In early March, both SHARP nominees purportedly sold their

---

[14] In August 2016, the company's shares underwent a 12.5:1 forward stock split, issuing 12.5 shares for each existing 1 share.  The share amounts discussed here are on a post-split adjusted basis.

blocks of 1.75 million shares to two other SHARP nominees, Quezon (which also sold PSNX), and Hilton Capital Inc. ("Hilton"). Quezon and Hilton then directed that their GRMX shares be transferred to the Asset Management Firm, which deposited the shares with different brokers. Quezon and Hilton provided the same credit card in the name of Esquire Corporate Services—a company associated with KELLN—to pay the transfer agent's fees.

70.     The third tranche of sales from GRMX S-1 investors to a SHARP nominee took place in mid-March. The acquiring SHARP nominee immediately sold the shares to a different SHARP nominee—Riverfall Group Ltd. ("Riverfall"), which was previously the SHARP nominee entity Redfern—and directed that the shares be transferred to the Asset Management Firm, which deposited the shares with a broker. Riverfall provided the same credit card to the transfer agent as Quezon and Hilton.

71.     The share breakdowns and transfers were discussed via encrypted messages among CARRILLO, KELLN, CW-1, and CW-2. For example, in or about mid-February, CW-2 told KELLN that s/he had just spoken with "Fire"—i.e., CARRILLO—who had said that he was going to be sending the Asset Management Firm documents to facilitate a deposit of GRMX shares. KELLN responded the s/he had not yet "got the certs" and that "[a]s soon as I do, we will T it all up." CW-2 subsequently inquired again, as "Fire [is] saying he wants me to try and get this in asap." KELLN responded: "I have to transfer all the stock to the Noms first. Fire needs to relax. There is a process." On or about March 9, 2017, CW-1 instructed KELLN to "re-do the GRMX quezon instruction letter" because it identified the wrong stock.[15] The

---

[15] Quezon's initial instruction letter to the transfer agent mistakenly indicated that it was enclosing a share certificate for stock of Vitality BioPharma, Inc. As discussed further below, Vitality BioPharma was simultaneously the subject of a pump-and-dump scheme led by VELDHUIS using SHARP's nominees and the Asset Management Firm.

corrected instruction letter was sent that same day.  In the metadata for the corrected instruction letter, the author is identified as "Courtney Kelln-Yul."

72.      Also on or about March 9th—at or about the same time that Quezon and Hilton were engaged in the transfer of shares to the Asset Management Firm—CARRILLO messaged CW-1 and CW-2 to ask a "huge favor."  Noting that KELLN had emailed them the necessary GRMX paperwork, CARRILLO asked CW-1 and CW-2 to facilitate the share transfers and deposits "asap," adding that it was "urgent so we can have a good month lol."

73.      Less than a week later,  on or about March 14, CARRILLO again messaged CW-1 and CW-2, noting that the first block of 1.75 million GRMX shares was "cleared today" to the Asset Management Firm, and that the second two blocks were at the transfer agent pending the receipt of additional paperwork.  CARRILLO identified Hilton and Riverfall as the two entities that would be holding the GRMX shares.  CARRILLO added:  "Please also do best to have the 1.75 [million shares already cleared] ready to go at open - we gonna drop that shit." CARRILLO's description of the share transfers matches how they were, in fact, transferred and deposited.  Brokerage records also reflect that CW-1 provided a false and misleading questionnaire to at least one of the brokers receiving GRMX shares.  Among other false and/or misleading statements, CW-1 represented on the questionnaire that the depositing shareholder— the Asset Management Firm, on CARRILLO's behalf—did not own more than five percent of the company's shares.[16]

---

[16]      CW-1 has also noted, however, that this particular broker was sometimes in on the scheme and therefore s/he believes the broker would not have cared had the broker been accurately informed of the concerted action among the nominee entities holding the shares.

74.     Beginning on or about that same day, March 14, 2017, and extending into early May 2017, the Asset Management Firm sold all of the GRMX shares transferred to it from Quezon, Hilton, and Riverfall, which by that point included two additional deposits from Hilton and Riverfall totaling nearly 2 million shares.  The additional deposits came after CARRILLO messaged CW-1 and CW-2 on or about March 23 to ask, "Can u take the remaining 3.2m grmx?"  In total, the Asset Management Firm deposited and sold over 7.2 million GRMX shares in less than two months, accounting for approximately 20 percent of the total outstanding GRMX shares and approximately 50 percent of the float.  The proceeds were approximately $5 million, of which approximately $3.4 million was generated during the first four days, just after CARRILLO's statement "we gonna drop that shit."

75.     Encrypted messages reflect that CARRILLO directed the GRMX selling.  For example, on or about March 14, CARRILLO directed CW-1 to "Sell 25k grmx at .80," "Sell 50k grmx at .675," and "Sell another 50k grmx at .675," before commenting that he was "Going slow."  CARRILLO later asked CW-1, "Can I turn this up now?", and his directions subsequently escalated: "Sell 185k at .66 grmx," "Sell 150K grmx at .657," "Sell 100k at .656 grmx," and "Sell 300k grmx at .644."  CARRILLO did not specify from which nominee entity's holdings to sell the shares—that decision was made by CW-1—reflecting that CARRILLO had control over all of the nominee shares.  At the end of the first day, CW-1 reported to CARRILLO that they had sold one million shares, the same amount reflected in the brokerage records for the various nominees.

76.     The sales coincided with a dramatic increase in GRMX's market volume.  In the two weeks preceding March 14, an average of less than 100,000 GRMX shares traded per day. During the two weeks starting March 14, the average increased to over 2.5 million shares per

day.  GRMX's price also spiked.  In mid-February, the price vacillated between $0.40 and $0.60 per share.  During the period mid-March through mid-April, it jumped as high as $1.21, before crashing to below $0.20 by June.

77.     The sales, and the increase in GRMX's share price and trading volume, also coincided with a multifaceted promotional campaign.  Records obtained from an investor relations company incorporated in Wilmington, DE, reflect that CARRILLO hired the company to draft eight press releases touting Garmatex and its purported fabric technology.  The press releases were issued between March 10, 2017 and April 21, 2017.  The investor relations company communicated with CARRILLO using encrypted messaging applications and was paid by wire from the Asset Management Firm in May 2017.  The payment was debited to a SHARP nominee.  Similarly, records from an email marketing firm based in North Carolina for an account using the name "Global Stock Advantage" reflect that the account sent at least 20 mass marketing emails related to Garmatex between March 17 and April 27, 2017.  The emails had subject lines such as, "Urgent: Buy GRMX" and "Garmatex Just Keeps On Going Higher."  The account holder was an entity that received $350,000 in two payments from the Asset Management Firm in April and May 2017.  The payments were debited to Riverfall, which was selling GRMX shares at the time.  The contact person listed on the account had the same name as the account owner associated with one of the intermediary Mexican bank accounts used to transfer proceeds to CARRILLO.

78.     Investors who purchased GRMX during this time period reported receiving calls soliciting their investments.  Records and communications tie those calls to the boiler room CARRILLO used in Medellin, Colombia.  For example, encrypted messages reflect that CARILLO was traveling on one of the trading days in March 2017 when he was directing

34

GRMX sales, and informed CW-1 and CW-2 that, if he did not have internet access while traveling, Boiler Room Operator 2 "would relay orders" that day.  The Medellin boiler room's involvement is also corroborated by records from the voice-over-internet (VOIP) service provider that provided the phone numbers from which prospective investors received calls.  The email address associated with the VOIP account holder received multiple emails in 2017 from an individual CW-3 identified as working with Boiler Room Operators 1 and 2 in Medellin ("Boiler Room Operator 3"), including an invoice from a Medellin Porsche dealership for a car in the name of Boiler Room Operator 1's spouse.  And records reflect that the IP address used to log in to the VOIP account in February and March 2017 was also used to log into (i) Boiler Room Operator 3's brokerage account and (ii) the bank account of Boiler Room Operator 1's wife.[17]

79.     An investor in West Newton, MA was among those who received phone calls soliciting investments in GRMX, and who subsequently purchased GRMX shares, during the time the Asset Management Firm was dumping shares.  The investor also received two promotional emails touting GRMX from Global Stock Advantage, discussed above.

### OneLife Technologies Corp. (OLMM)

80.     In or about 2017 and 2018, OneLife Technologies Corp. ("OneLife") was purportedly a "mobile medical data and technologies company" based in Illinois.  The company was incorporated in Nevada in 2014 under a different name.  It traded on the over-the-counter market under the ticker symbol "OLMM."

81.     Corporate filings and transfer agent records reflect that, in or about January 2014, OneLife issued 70 million shares to its sole director and officer and, in or about February 2014, it

---

[17] IP addresses are unique numerical labels assigned to each device connected to a computer network.

issued approximately 22.7 million shares to 38 investors from Jamaica, raising approximately

$3,410.  Later that year, the company filed a Form S-1 with the SEC to register the shares

purchased by the 38 investors (the "OLMM S-1 investors"), which had the effect of permitting

their subsequent re-sale.[18]  In or about October 2017, the company had approximately 92.7

million shares outstanding, although this number decreased to approximately 62.7 million after a

share cancellation in December 2017.  On or about March 2, 2018, the company registered its S-

1 shares with the SEC under Section 12 of the Exchange Act.

82.     Encrypted communications and records from the Asset Management Firm reflect

that CARRILLO controlled the overwhelming majority of OneLife's shares.  In or about

September 2016, approximately 37 of the 39 certificates issued to OLMM shareholders were

delivered to the Asset Management Firm, including the 70 million share certificate issued to the

company's sole director and officer (representing approximately 75 percent of the company's

total shares).  In or about January 2017, CARRILLO emailed the Asset Management Firm to

confirm that it had received the certificates.  CARRILLO also emailed pre-signed signature

pages for share purchase agreements for 35 of the 38 OLMM S-1 investors and told the Asset

Management Firm that it would receive the physical signature pages the following day, which it

did, from a Vancouver address.  CARRILLO also emailed a template share purchase agreement

for OLMM shares in Word format, with the purchaser and seller names blank.

83.     In or about February, March, and April 2017, CARRILLO, KELLN, and CW-2

discussed how to divide the OLMM S-1 investors' shares into blocks of just under five percent

---

[18] In or about June 2017, the company's shares underwent a 2:1 forward stock split,
issuing 2 shares for each existing 1 share.  The share amounts are discussed here on a post-split
adjusted basis.

of the total outstanding shares and how they would be deposited.  For example, in February

2017, CW-2 sent CARRILLO an encrypted message noting that s/he had "allocated the certs into

5 posns of just under 5%."  CW-2 noted that CARRILLO had originally wanted half the shares

placed with SHARP nominees and asked if he was happy with three positions going to "Celt,"

i.e., KELLN.  CARRILLO responded, "Yes."  In March 2017, CW-2 emailed CARRILLO a

more specific proposed breakdown of the five positions, each just under or equal to five percent.

CARRILLO responded with directions as to how each should be deposited:  two with SHARP

nominees, and three "direct with" the Asset Management Firm.  And then in April 2017, CW-2

sent an encrypted message to KELLN, stating the s/he had "certs for positions of [OLMM] from

Fire" that he (i.e., CARRILLO) "wants me to send to you/the TA for putting into two bond

companies" (i.e., two SHARP nominees).  CW-2 identified the two positions as comprising 4.7%

and 4.4% of OLMM's outstanding stock, respectively.  CW-2 asked what steps should be taken,

to which KELLN responded, "Send certs and stock powers to me."  KELLN then provided her

address in British Columbia and stated that it was okay to use KELLN's name on the package

given that it was being sent by CW-2.

84.     Pursuant to CARRILLO's instructions, approximately 4.37 million shares were

transferred to an acquiring SHARP nominee entity in early June, and then further transferred to

Hilton (which had previously sold GRMX shares), before being deposited with a broker via the

Asset Management Firm.  In mid-June, approximately 4.67 million shares were transferred to the

Asset Management Firm, where they were allocated to a CARRILLO nominee—Compton

Capital Inc. ("Compton")—and deposited with a broker.  And in September, approximately 4.13

million shares were transferred to a SHARP nominee, and then further transferred to a different

SHARP nominee—Santos Torres—before being deposited with a broker via the Asset
Management Firm.

85.     In total, the Asset Management Firm deposited approximately 13.2 million
OLMM shares, which accounted for approximately 14 percent of OneLife's total outstanding
shares and approximately 92 percent of its float.  Following the share cancellation in December,
the percentage of the company's shares deposited with the Asset Management Firm increased to
approximately 21 percent.  As with GRMX, brokerage records reflect that CW-1 again provided
a false and misleading questionnaire to at least one of the brokers receiving OLMM shares
(namely, the same brokerage firm referred to above in Paragraph 73).

86.     In the meantime, in April 2017, OneLife announced that it had a new director and
officer who had acquired control of the original director and officer's 70 million shares (which
were in the Asset Management Firm's possession).  Transfer agent records and emails reflect
that CARRILLO directed the share transfer.  Specifically, on or about May 23, 2017,
CARRILLO emailed the Asset Management Firm a letter addressed to the transfer agent, on
Hilton's letterhead.  The letter instructed the transfer agent to transfer the 70 million shares to the
new director and officer.  Records from the Asset Management Firm indicate that it sent
CARRILLO's letter and the 70 million share certificate to the transfer agent, which effectuated
the transfer on or about May 30.

87.     The Asset Management Firm began selling the OLMM shares in or about
November 2017.  As with GRMX, CARRILLO directed the selling via encrypted messages,
including the following messages sent on various dates between February 23 and September 4,
2018: "Sell 50k olmm at 1.44"; "Sell 75k olmm at 1.47"; "Sell 76k olmm at .35"; "Sell 50k
olmm at .10 please"; "Sell 120k olmm at .30"; and "Sell 205k olmm at .39."   CARRILLO also

specified which of either his or SHARP's nominees should receive the proceeds of the stock sales. For example, on March 22, he directed: "Sell another 100k and book to [SHARP] also please."

88.     The selling continued through the beginning of October 2018. In total, the Asset Management Firm sold approximately 7.5 million shares, for total proceeds of approximately $5.2 million.

89.     Shortly after the selling began, in December 2017, CW-2 and KELLN discussed the remaining two five percent blocks, which had not yet been deposited. Via an encrypted chat message, CW-2 noted, "There are 2 other posns of OLMM still in certs" and proposed that "we can now start to bring [them] in as selling starts." KELLN responded, "Just send me all the specific details for each [share purchase agreement] you need. Seller name/purchaser name/ date/price/share amount." Encrypted messages reflect that CARRILLO and the Asset Management Firm took steps to line up the additional positions in September 2018, but ultimately those shares were never deposited.

90.     As with GRMX, the Asset Management Firm's selling took place during a promotional campaign CARRILLO directed. CARILLO hired the same investor relations company that drafted the GRMX press releases to draft five press releases touting OneLife's mission and technology. The releases were issued in January and February 2018. In March, the investor relations company received a wire from the Asset Management Firm for $20,000, which was debited to a SHARP nominee.

91.     During the period the Asset Management Firm was dumping shares, an investor in Reading, MA, purchased OLMM after receiving an unsolicited phone call from an individual touting the stock.

**Vitality Biopharma, Inc. (VBIO)**

92.     In or about 2016 through 2018, Vitality Biopharma, Inc. ("Vitality") was a

biopharmaceutical company based in Los Angeles that focused on the develop of cannabinoids.

It was incorporated in Nevada in June 2007 under a different name.  Immediately before July

2016, Vitality was known as Stevia First Corp. ("Stevia First") and was a biotechnology

company focused on stevia products.  Vitality traded on the over-the-counter market under the

ticker symbol "VBIO" and, before that, "STVF."

93.     Transfer agent records and records from the Asset Management firm reflect that,

between in or about November 2016 through September 2018, eight different SHARP nominees

(including four previously discussed) deposited and sold at least over 8.1 million VBIO shares

with the Asset Management Firm.[19]  Those shares ultimately accounted for over 33 percent of

Vitality's total outstanding shares as of September 30, 2018 (approximately 24.7 million).  CW-1

and CW-2 have described, and records and communications reflect, that VELDHUIS controlled

all of the VBIO shares deposited in the names of the eight SHARP nominees.  The shares were

sold during a promotional campaign funded by four of the same SHARP nominees, generating

approximately $16.8 million in proceeds.

94.     Vitality's public filings and transfer agent records reflect that all but

approximately six thousand of the aforementioned shares were acquired directly from Stevia

First pursuant to private securities purchase agreements.  These agreements were reached

immediately before the company changed its name to Vitality and effected a reverse stock split,

---

[19] In or about July 2016, the company underwent a 1:10 reverse stock split, issuing 1 share for every 10 existing shares.  The share amounts are set forth here on a post-split adjusted basis.

thereby reducing the shareholdings of all other Stevia First/Vitality shareholders.  Pursuant to the purchase agreements, SHARP nominees initially acquired 2.65 million shares in aggregate, with warrants providing the opportunity to purchase an additional 7.95 million shares in aggregate over the ensuing six months.  The shares were issued with restricted legends, but the SHARP nominees secured legal opinion letters from law firms beginning in or about November 2016 that opined, in sum and substance, that the restricted legends could be lifted and the shares deposited and sold.  The legal opinion letters were explicitly premised on the assumption that each of the shareholders—i.e., each of the SHARP nominees—was not an affiliate of Vitality and had not been so for the prior three months.  To obtain the opinion letters, the SHARP nominees submitted representation letters, purportedly signed by the beneficial owners of the nominees, stating that each was not an affiliate of Vitality, including in some instances by explicitly confirming that it was not a 10% shareholder of Vitality.

95.    The VBIO shares held by the SHARP nominees, however, were all under VELDHUIS's common control.  Transfer agent records reflect that the first tranche of 2.65 million shares purchased pursuant to the agreement were issued on or about May 17, 2016.  Those shares equaled approximately 25 percent of Vitality's then-total outstanding shares (approximately 10.6 million)—in other words, well over 10%.  Records from the Asset Management Firm and information in SHARP's Q accounting system reflect that those 2.65 million shares were issued to five SHARP nominees and associated in the Q accounting system with VELDHUIS in their entirety upon receipt.  Similarly, as additional tranches of VBIO shares were issued to SHARP nominees and deposited with the Asset Management Firm over the next fourteen months, they too were all associated with VELDHUIS in the Q accounting system.

96.     VELDHUIS's encrypted messages with CW-1 and CW-2 further demonstrate his control over their disposition.  The Asset Management Firm's records and trading records reflect that, as the SHARP nominees deposited VBIO shares, the Asset Management Firm would immediately begin selling the shares.  Encrypted messages between VELDHUIS, CW-1, and CW-2 reflect that VELDHUIS directed the stock sales in detail on a daily basis, stating, for example, "Sell 50k VBIO @ 1.30"; "sell 15k VBIO @ 2.11"; and "Sell 15k VBIO @ 3.10."

97.     As shares were sold, the SHARP nominees' holdings would then be replenished with additional shares acquired pursuant to the warrants, and encrypted messages reflect VELDHUIS regularly indicated that additional VBIO shares would be forthcoming.  For example, in early January 2017, after the Asset Management Firm had sold nearly all of the 1.75 million VBIO shares that had been deposited to that point, CW-1 asked about a "VBIO replen" and indicated that CW-1 was only aware of an additional 294,000 shares that were forthcoming. VELDHUIS responded "And 750k right behind that / And 294k when that starts to go / And then 294k again / And so on ...."  Subsequent deposits with the Asset Management Firm in the names of Morris Capital, Inc. ("Morris"), Quezon, and Hilton (all SHARP nominees) match this forecast.  Similarly, in June 2017, VELDHUIS alerted CW-1 and CW-2 that "1,800,000 VBIO on its way."  CW-2 asked if KELLN was "going to send us docs," to which VELDHUIS responded "Yes."  KELLN confirmed that same day in a separate encrypted message that "U will have tons of VBIO coming at you next week."  Later in June and in July, 1,788,236 shares were deposited with the Asset Management Firm (and subsequently sold) in the names of Quezon, Riverfall, and Santos Torres (all SHARP nominees).

98.     Encrypted messages similarly reflect VELDHUIS keeping tabs on the status of deposits with the Asset Management Firm.  In late-December 2016, when Vitality shares had just

started trading over $2.00 per share (over double the prices at which VBIO had been trading

earlier in 2016), VELDHUIS urged CW-1 and CW-2 to "Please push" the transfer agent to clear

a 500,000 share deposit, adding that there was "So much money on the table!"

99.     Encrypted messages among KELLN, CW-1, and CW-2 also reflect a concerted

effort to ensure that no one SHARP nominee held over 5% of Vitality's outstanding shares at any

one time.  In February 2017, KELLN was facilitating a deposit of 750,000 VBIO shares for

Hilton.  KELLN's messages to CW-1 and CW-2 reflect, however, that KELLN recognized that

the deposit would push Hilton's holdings over 5% based on shares Hilton had not yet sold

through the Asset Management Firm.  To address this issue, KELLN directed CW-1 and CW-2

to "Pls make sure to allocate all Vbio sales to the [Hilton] account today. We need to make room

for the pending 750k."  KELLN then added, "Again 5% rule is biting me ass."

100.    Encrypted messages between KELLN, CW-1, and CW-2 also reflect that the

Asset Management Firm was careful not to hold, in total across SHARP's nominees, more than

20% of Vitality's outstanding shares at any one time.  In January 2017, CW-2 asked KELLN

"Are we going to receive any more VBIO? Can see lots in REST and I'm hungry!"  Review of

the Q accounting system reflects that "REST" is a category in which shares can be placed in the

system.  KELLN responded, "Acco [i.e., VELDHUIS] said u didn't want anymore. Have u

changed ur mind?"  CW-1 responded, "We didn't want to hold over 20% at any one time. The

rate we are selling, happy to queue up next [deposit]."

101.    Transfer agent records and encrypted messages further reflect KELLN's

involvement in transferring VBIO shares to the Asset Management Firm.  In December 2016,

CW-2 sent an encrypted message to VELDHUIS, stating that the transfer agent was awaiting

receipt of a credit card authorization before completing a share transfer.  CW-2 asked

VELDHUIS, "Please get Celt [i.e., KELLN] to call them asap."  VELDHUIS responded, "Sitting

with her. Doing now."  Transfer agent records for several of the Vitality share transfers reflect

that a credit card in the name of Esquire Corporate Services—associated with KELLN—paid the

transfer agent's fees.

102.    Transfer agent records and encrypted messages also reflect KELLN's

involvement in obtaining the aforementioned legal opinions for the SHARP nominees.  Many of

the legal opinions supporting the VBIO share transfers to the Asset Management Firm were

issued by an attorney in Arizona ("Attorney 1").  In August 2018, an email account for Esquire

Corporate Services emailed the Asset Management Firm, asking for copies of "certificates of

incumbency" for two SHARP nominees (Riverfall and Varese Capital, Inc. ("Varese")) and

noting that the certificates were needed "so I can sent [sic] the VBIO shares in for legend

removal."  The email was a forward of an exchange between Attorney 1's paralegal and Esquire

Corporate Services, which signed one of its emails "C" (the first letter of KELLN's first name).

In an encrypted message the next day, KELLN told CW-1 and CW-2 that "Esquire is dealing

with the lawyer in [sic] Riverfall and Varese behalf."

103.    As with GRMX and OLMM, communications and brokerage records reflect that

the Asset Management Firm provided false and misleading questionnaires and other information

in connection with VBIO share deposits.  For example, in May 2017, in connection with a

deposit of 212,989 additional VBIO shares with a broker, CW-1 signed a "Deposit Securities

Request" in which s/he made several false and/or misleading representations.  Among them,

CW-1 falsely represented that the Asset Management Firm (which was holding the shares for a

SHARP nominee, for VELDHUIS' benefit) was not, and had not been, a "5% owner of the

Issuer."  In truth, as recently as early March 2017, the Asset Management Firm had held over

1.68 million VBIO shares for several SHARP nominees, equal to at least 7.6% of Vitality's then

outstanding shares.  CW-1 also falsely represented that the Asset Management Firm had received

only 1,059,803 VBIO shares within the last year and falsely represented that it was not selling

VBIO shares through any other broker.  In truth, the Asset Management Firm was selling VBIO

shares that same day through another broker and had received, in total, over 4.8 million VBIO

shares since November 2016.  (The 1,059,803 shares identified on the form only accounted for

the portion of the 4.8 million shares that had been previously deposited with that broker.)

Similarly, in March 2017, in connection with four deposits the Asset Management Firm was

placing with a different broker, CW-1 represented in an email to the broker that each of the four

shareholders (all SHARP nominees) was "solely owned by one individual." CW-2 also

separately sent an email providing the names of the purported beneficial owners.  In truth,

however, the VBIO shares held by the SHARP nominees were actually controlled by

VELDHUIS, not the purported beneficial owners whose names were provided to the broker.

104.    The Asset Management Firm's sales of VBIO shares also coincided with a

promotional campaign funded by the same SHARP nominees doing the selling.  Bank records

reflect that, between September 2016 and October 2017, a company based in Maryland that

organizes advertising campaigns for publicly-traded companies ("Media Company 1") received

$587,500 from the Asset Management Firm's banking provider.  The wire details for the

payments reflect that they were associated with four SHARP nominees (Morris, Quezon, Hilton,

and Riverfall), each of which was selling VBIO shares at various points during that same

timeframe.  Media Company 1 allocated the incoming payments to a VBIO marketing campaign,

and invoices the SHARP nominees sent the Asset Management Firm stated that Media Company

1 was providing items to include "Small Cap Leader Native Advertising," "Momentum Alerts," "Street Alert," and "The Stock Report."

105.    Media Company 1's records for its VBIO marketing campaign reflect that it in turn hired other firms to draft and circulate marketing materials.  Among the firms Media Company 1 hired was a firm based in Florida (Media Company 2), which was paid $100,000 in late November and early December 2016.  Correspondence between the media companies reflects that Media Company 2 specialized in marijuana stocks.

106.    During the period the Asset Management Firm was selling shares, an investor in Shrewsbury, MA purchased VBIO shares after receiving emails touting the stock from a marijuana stocks newsletter associated with the individual who ran Media Company 2.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

## CONCLUSION

107.    Based on my knowledge, training, and experience and the facts set forth in this affidavit, I have probable cause to believe and I do believe that SHARP, CARRILLO, VELDHUIS, and KELLN, together with others known and unknown, committed (i) conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, and (ii) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

Respectfully submitted,

Keith Brown
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to telephonically in accordance
with Fed. R. Crim. P. 41(d)(3) on this  4  day of August 2021.

Honorable Jennifer C. Boal
United States Magistrate Judge
District of Massachusetts